AUSA:   Corinne Lambert                    Telephone:  (313) 226-9129
AO 91 (Rev. 11/11)  Criminal Complaint         Special Agent:        Megan So                       Telephone:  (313) 590-4692

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Michigan

United States of America
   v.

Tammy Hopkins

Case No.

2:26−mj−30092
Assigned To : Unassigned
Assign. Date : 2/19/2026
Description: SEALED MATTER (DA)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 2019 - February 2026_____ in the county of _____Wayne_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 641 | Theft of Government Funds |
| 42 U.S.C. § 408 | Social Security Benefit Fraud |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1344 | Bank Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Megan SO, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  __February 19, 2026__

City and state:  __Detroit, Michigan__

_____
*Judge's signature*

Elizabeth Stafford - Magistrate Judge
*Printed name and title*

Save   Print

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT AND ARREST WARRANT

I, **MEGAN SO,** being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1)   I am a Special Agent with the Social Security Administration, Office of the

Inspector General, Office of Investigations (SSA/OIG/OI) and have been so

employed since February 2020. I hold a bachelor's degree in Business

Administration from the University of Michigan–Dearborn. I am a graduate

of the Federal Law Enforcement Training Center in Glynco, GA, having

completed its Criminal Investigator Training Program. Additionally, I

completed the Inspector General Investigator Training Program through the

Council of the Inspector General on Integrity and Efficiency. Before

becoming a Special Agent, I spent eleven years processing benefit

applications and resolving benefit-related matters for the SSA, first as a

Claims Representative, and then as an Operations Supervisor. My current

job duties include conducting investigations of violations of Social Security

laws and related statutes, including but not limited to Title 18 U.S.C. § 641

(Theft of Government Funds), 42 U.S.C. § 408 (Social Security Benefit

Fraud), and 18 U.S.C. § 1028A (Aggravated Identity Theft). I am authorized

to execute warrants and make arrests.

2)    I have been assigned to an investigation concerning the disposition of Social

Security benefits paid in the name of Jane Evans following her death.  Based

on my investigation thus far, there is probable cause to believe that Evans's

daughter, Tammy HOPKINS (hereinafter HOPKINS) violated 18 U.S.C.

§ 641 (Theft of Government Funds) and 42 U.S.C. § 408 (Social Security

Benefit Fraud) by willfully and knowingly retaining and converting to her

own use the Social Security benefits paid in the name of Evans after her

death. There is probable cause to believe that HOPKINS violated 18 U.S.C.

§ 1028A (Aggravated Identity Theft) by impersonating her deceased mother

on a recorded telephone call with the SSA and establishing a Social Security

account online using her mother's identity. There is also probable cause to

believe that HOPKINS violated 18 U.S.C. § 1344 (Bank Fraud) and 18

U.S.C. §1028A by stealing checks from her former employer, forging

endorsement signatures on them, and depositing them into her bank account.

3)    I have prepared this affidavit in support of a criminal complaint and arrest

warrant for HOPKINS. The facts in this affidavit come from my personal

observations, my training and experience, and information obtained from

other agents and witnesses. This affidavit is presented for the limited

purpose of showing there is sufficient probable cause for the requested

complaint and warrant and does not set forth all of my knowledge about this matter.

## **INVESTIGATION SUMMARY**

4) Jane Evans was receiving Social Security retirement benefits when she passed away on December 20, 2018, in Deerfield Beach, FL. Evans's death was not properly reported to the SSA and, as a result, the SSA continued to issue monthly benefits in Evans's name through February 2026.  Despite her death, in February 2025, an online "my Social Security account" (MySSA account) was established under Evans's identity and used to change Evans's address to that of HOPKINS's residence in Riverview, MI. In March 2025, the SSA National 800 Number Network (N8NN) received a telephone call from a woman who identified herself as Evans and provided Evans's personally identifiable information (PII) in response to the SSA representative's security questions. On that call, the woman redirected Evans's monthly SSA benefit payments to a PNC Bank account solely owned by HOPKINS.

5) HOPKINS used her PNC Bank debit card to spend the SSA benefits at various merchants, such as gas stations, pharmacies, Delta Airlines, restaurants/fast food, and supermarkets, as well as for ATM cash

withdrawals. During an interview, HOPKINS admitted to establishing Evans's MySSA account, impersonating Evans during the telephone call to the SSA, changing Evans's address and direct deposit information, and spending the money.

6)   Additional review of HOPKINS's bank records revealed the deposit of eight checks issued to companies and/or individuals other than HOPKINS. Through further investigation, HOPKINS's prior employer identified seven of the checks as stolen and some of the endorsement signatures as forged. Additionally, HOPKINS stole a blank personal check from her prior employer, fraudulently wrote it out to herself, and deposited it; she also used her prior employer's personal bank account information to pay for at least five of her DTE Energy payments.

7)   The fraud loss associated with HOPKINS's various fraudulent activities is approximately $109,035.00.

## **PROBABLE CAUSE**

8)   The SSA administers monthly benefit payments under Title II of the Social Security Act, including Retirement, Survivors, and Disability insurance. The death of the beneficiary causes these monthly benefits to terminate. The SSA obtains death information from a variety of sources including family

members, funeral homes, and state vital records offices. In rare instances, the SSA erroneously pays benefits to deceased individuals. This is often the result of the SSA not receiving reports of the death, or reports of deaths containing personal identifiers that are inconsistent with SSA records, deaths that occur outside the United States, or other systems interface errors. In this case, it is unclear why SSA records were not updated to reflect the beneficiary's death.

9) In September 2025, the SSA/OIG/OI received an allegation from the SSA Office of Financial Policy and Program Integrity (OFPPI) – Fraud Examination Team (FET) pertaining to SSA Title II beneficiary, Jane Evans. Evans passed away on December 20, 2018, in Florida, but her death was not properly reported to the SSA. This led to the improper continued issuance of Evans's Social Security benefits.

10) I obtained Evans's death certificate from the State of Florida, which confirmed Evans's date of death as December 20, 2018. The death certificate listed HOPKINS as the informant and indicated that Evans and HOPKINS resided in Florida.

11) According to SSA records, Jane Evans became entitled to Title II Social Security Retirement benefits on her Social Security record effective April

2005. In May 2006, she became dually entitled to divorced spouse's benefits off her ex-husband's record. The benefit amounts were combined and issued as one payment under her record. Evans's address of record for her SSA benefits was 29425 Caddyshack Ln, San Antonio, FL. Her benefits were directly deposited into a Truist Bank account ending in 0189.

12)   I reviewed records related to Truist Bank account ending in 0189.  This account was jointly owned by HOPKINS and Evans. It was used for the receipt of Evans's monthly SSA benefits from prior to her death through December 2024; this was the primary income deposited into the account. Most of the funds in this account were depleted via transfers to other Truist Bank accounts owned by HOPKINS, frequently resulting in a monthly bank account balance of less than $10.00. This account was closed on December 23, 2024, with a $0.00 balance.

13)   On February 11, 2025, an online "my Social Security account," (MySSA account) was created under Evans's name, Social Security Number (SSN) and date of birth. The account was established using email address tahopkins313@comcast.net and telephone number 954-892-9306. Once established, the MySSA account was used to change Evans's address to 18565 Hinton Rd., Riverview, MI 48193.

14)     On March 3, 2025, the SSA's National 800 Number Network (N8NN)

received an inbound call on a recorded line from a female who identified

herself as Evans. When the SSA representative asked security questions to

verify Evans's identity, the caller was able to accurately provide the

following PII related to Evans: SSN, date of birth, current address, and

parents' names.  The caller indicated that she recently moved in with her

daughter, and that she had attempted to change her address and bank account

information online. She said that she hadn't received her retirement benefits

in months, and that she received a letter stating her address or direct deposit

was incorrect. The representative confirmed that Evans's address had been

updated but informed her that online direct deposit changes take 60 days to

update. The representative asked the caller to verify the old routing number

and account number used for direct deposit. The caller indicated that she was

struggling to locate an old check and said that she may need to wait for her

daughter to get home to help her. Eventually, the caller was able to verify

the old account information. She also provided the SSA representative with

new bank account information: a PNC account ending in 9701, which she

said was in her and her daughter's names. The caller also provided her

telephone number as 954-892-9306. Evans's direct deposit information was changed because of this telephone call.

15) As discussed below, evidence gathered during this investigation indicates that HOPKINS is the individual who opened Evans's MySSA account and who initiated the call described above and impersonated Evans.

16) I obtained HOPKINS's FL driver's license (DL) as part of the investigation. She was issued FL DL #H125801658340 in the name of "Tammy Ann Hopkins Lysak". HOPKINS has not been issued a DL in Michigan. HOPKINS has a 2018 Ford Edge, plate #7NUV77, registered in Michigan to the address of 18565 Hinton St., Riverview, MI. This is also the address HOPKINS used on accounts that she has established with Comcast Cable, T-Mobile, PNC Bank, and DTE Energy (see below).

17) I obtained Comcast Cable Communications LLC (hereinafter Comcast) customer records, which showed that HOPKINS of 18565 Hinton St., Riverview, MI, telephone 954-892-9306, utilizes their company for Internet services. Her email user ID is tahopkins313. Comcast records confirmed that one of the IP addresses used to access Evans's MySSA account, on April 15, 2025, is associated with HOPKINS's Comcast account.

18)    According to T-Mobile records, HOPKINS was assigned telephone number
       954-892-9306 in December 2019. Her call history reflects that on March 3,
       2025, she used her T-Mobile cell phone number to call the SSA's N8NN at
       800-772-1213, twice. The first call only lasted approximately four minutes,
       which does not appear to have resulted in getting connected with a
       representative. The second call lasted approximately 95 minutes and resulted
       in Evans's fraudulent SSA direct deposit change.

19)    I also obtained PNC Bank records for account ending 9701, the account that
       was used for the direct deposit of Evans's SSA benefits from March 2025
       through December 2025.  Records revealed that the account was opened on
       February 10, 2025, and is solely owned by HOPKINS of 18565 Hinton St.,
       Riverview, MI, telephone 954-892-9306, email address
       tahopkins313@comcast.net. The identification she provided to open the
       account was FL ID #H125801658340.  PNC provided bank surveillance
       recordings of transactions processed on August 12, 2025, and September 19,
       2025, which showed a woman entering the PNC Bank branch and
       processing transactions on the account. I compared the woman observed in
       the bank surveillance recordings to HOPKINS's FL DL photograph, and it
       depicted the same individual.

20)     A majority of the funds deposited into HOPKINS's PNC Bank account, including Evans's monthly SSA benefits, were depleted via ATM withdrawals and debit card transactions. Her debit card was used at various merchants including gas stations, pharmacies, Delta Airlines, restaurants/fast food, T-Mobile, and supermarkets. She also withdrew over $6,400.00 via bank withdrawal slips, signed by HOPKINS.  HOPKINS typically carried over an ending balance from one statement to the next, however this amount varied vastly. Her lowest ending statement balance was $0.89.

21)     PNC records also contained a photocopy of a personal check from the joint account of HOPKINS's former employer, G.L., and his wife, M.L., a Huntington Bank account ending in 1106. The check is dated May 17, 2025, and written out to HOPKINS in the amount of $2,000.00. HOPKINS deposited this check on May 22, 2025; however, the deposit item was returned on May 27, 2025. *[Agent Note: As detailed below, according to G.L., he never gave this check to HOPKINS, nor did he sign this check.]*

22)     According to DTE Energy customer service records, HOPKINS is the customer for the address of 18565 Hinton St., Riverview, MI. In September 2025, HOPKINS used the debit card associated with her PNC account ending in 9701 as the payment method for her DTE Energy bill.  HOPKINS

also used the Huntington Bank account ending in 1106 that belongs to G.L. to pay her DTE Energy account balance on the following dates in the following amounts:

- 4/11/2025 - $351.90
- 6/27/2025 - $197.19
- 7/29/2025 - $156.95
- 9/26/2025 - $193.36
- 10/24/2025 - $149.91

*[Agent Note: As detailed below, G.L. stated that he never gave HOPKINS authorization to use his bank account to pay for her DTE Energy bill and that he was unaware of this fraudulent activity.]*

23)   I also obtained and reviewed records related to a Truist Bank account ending in 8088, owned solely by HOPKINS. HOPKINS used this account for a variety of transactions. Relevant to this investigation, HOPKINS deposited eight checks that were not addressed to her but rather to her former employer and other private companies unassociated with HOPKINS.  The eight checks were issued between November 7, 2023, and August 18, 2024. They included three U.S. Treasury checks, one State of Michigan check, one state of Idaho check, and three private business checks.  Most of the checks were first endorsed using the name of G.L.; then they were subsequently endorsed

by or made payable to HOPKINS. The check amounts varied between $252.51 and $9,999.00. In total, the checks amounted to $27,527.59.

24) Truist Bank records included email correspondence initiated from tahopkins313@comcast.net, on January 24, 2025, at 11:16 AM, regarding the suspension of her bank accounts. In a portion of this email, HOPKINS stated:

> "There are two accounts with my name - one is my personal account and the other is my mom's account with my name on it where she receives her Social Security deposits.  Her account was also locked.  There was a deposit from Social Security on Dec. 18th, 2024 and another one deposited Jan. 15th, 2025.  The amount deposited each month is $958.00 - $963.00 (the amounts can vary a little).  Why are you holding that?  I have no way of obtaining her funds to pay for her medical and her medical is very important as she is non-communicative as she has Alzheimer and Parkinson's Disease…. I need an explanation immediately."

25) Truist Bank records also include a recorded call with HOPKINS regarding problems accessing her online account. During a portion of the conversation, the Truist Bank representative asked if there was fraud involved with her account. HOPKINS indicated there was no fraud on the joint account, where her mother's Social Security was deposited. She indicated fraud was involved with her other account because of an issue with a prior employer who deposited checks into her account.

26) I attempted to interview HOPKINS on January 20, 2026. When she did not answer the door at her residence, I called her at 954-892-9306. I identified myself and indicated I wanted to speak with her regarding SSA benefits issued to her mother. HOPKINS agreed to meet with me later that day at her residence. HOPKINS rescheduled the interview three times prior to meeting with me.

27) On February 11, 2026, I interviewed HOPKINS at the SSA office in Wyandotte, MI. HOPKINS acknowledged that her mother, Evans, passed away on December 20, 2018, in Florida. She admitted that she impersonated Evans when she called the SSA N8NN, that she created Evans's MySSA account, and that she redirected Evans's SSA benefits into a PNC bank account solely held by her, all of which she stated she knew was wrong. She also indicated that she changed Evans's address to her own address in Michigan. HOPKINS alleged that she continued receiving Evans's SSA retirement benefits, but she thought they were supposed to be disabled adult child's survivor's benefits issued to her. However, she acknowledged that the benefits always came in Evans's name and were labeled as retirement benefits.

28)     During the interview, HOPKINS alleged that she visited an SSA office in
Florida to discuss her mother's benefits and that the office told her that she
(HOPKINS) was receiving disabled adult child benefits. HOPKINS also
alleged that she called the SSA previously and they would not allow her to
speak on Evans's behalf, and that is the reason why she impersonated her
deceased mother on the March 2025 call. She stated that she made the
March 2025 call to straighten out the type of benefits issue. *[Agent note:
Despite HOPKINS's assertions, during the call with the SSA, HOPKINS
made no mention of attempting to discern the type of benefits that were
being issued on Evans's record. The only issues mentioned were the change
in address and direct deposit information. Also, SSA records show no
contacts with the SSA relative to Evans from December 20, 2018, until
March 2025, when HOPKINS called the SSA N8NN. This is because, in
order for an SSA employee to look at an individual's SSA record, they must
enter the individual's SSN into the SSA system. Evans's SSN was not entered
into the SSA system, and, in turn, her SSA records were never accessed,
between her date of death and the March 2025 call.]*

29)     When HOPKINS was questioned about the various checks that she endorsed
and deposited into her bank account, but were not addressed to her, she

- 14 -

initially denied it and then suggested fraud. She said that if the checks went into her account, then they were reversed. I told HOPKINS that her signature was on the checks and that they were deposited into her account. She said that she didn't think they were all her signatures. Then she said that the checks were probably payments G.L. owed her for payroll. The only check she said she recalled was the U.S. Treasury check issued to G.L. for $252.

30)   I interviewed HOPKINS's former employer, G.L., as part of the investigation.  He indicated that HOPKINS was his employee until September 24, 2024, and he identified her from her FL DL photograph. G.L. explained that HOPKINS was his administrative assistant and that her duties included retrieving the mail, ordering business supplies, and making business payments. G.L. stated that HOPKINS had access to his personal and business financial information.

31)   I showed G.L. the seven checks deposited into HOPKINS's bank account that appeared to be associated with him and his businesses. Five of the checks were endorsed with his signature. G.L. indicated that he had never seen any of those checks, he never signed any of those checks, and he never asked HOPKINS (or any other employee) to deposit a business check into

her own personal bank account. He also stated that never in a million years would he give an employee a business check in lieu of a payroll check to be deposited into their private bank account. G.L. informed that all the checks were associated with G.L.'s business except for one. That check was mailed to G.L.'s residence and was addressed to the prior owner of his residence.

32) I subsequently called G.L. to inquire about the personal check written from his Huntington Bank account ending in 1106 for $2,000.00 to HOPKINS, in May 2025. He indicated that he did not write that check nor did he give HOPKINS authorization to use the check. I informed him of HOPKINS's DTE Energy payments made with his Huntington Bank account, and he stated that he never authorized the charges, and he did not realize the fraudulent activity had occurred on his bank account.

## **CONCLUSION**

33) Accordingly, based upon my training, experience, and the facts set forth in this Affidavit, there is probable cause to believe that HOPKINS violated Title 18 U.S.C. § 641 (Theft of Government Funds), 42 U.S.C. § 408 (Social Security Fraud), 18 U.S.C. § 1028A (Aggravated Identity Theft), and 18 U.S.C. § 1344 (Bank Fraud) by willfully and knowingly converting to her own use monies of the SSA erroneously paid in the name of her deceased

mother, impersonating her deceased mother when contacting the SSA for the
purpose of redirecting the deceased's SSA payments, using her mother's
identity to create an online SSA account, forging signature endorsements on
stolen checks from her prior employer, using a stolen personal check in an
attempt to further defraud her prior employer, and fraudulently using stolen
bank account information to pay her personal utility bills.

I, MEGAN SO, Special Agent with the Social Security Administration, Office
of the Inspector General, Office of Investigations, being duly sworn according to
law, hereby affirm that the facts stated in the foregoing affidavit are true and
accurate to the best of my knowledge, information, and belief.

MEGAN SO
Special Agent, SSA/OIG/OI

Sworn to before me and signed in my presence

and/or by reliable electronic means.

ELIZABETH STAFFORD
United States Magistrate Judge

Date:   February 19, 2026

- 17 -